**HUNT–WESSON FOODS, INC., Plaintiff-Appellant,**

v.

**RAGU FOODS, INC. and Chesebrough-Pond's, Inc., Defendants-Appellees.**

No. 77–2286.

United States Court of Appeals, Ninth Circuit.

Submitted Dec. 5, 1979.

Decided Aug. 15, 1980.

Rehearing Denied Sept. 29, 1980.

Martin J. Trupiano, argued, Blecher, Collins & Hoecker, Los Angeles, Cal., for plaintiff-appellant.

Richard L. Fruin, John G. Wigmore, Los Angeles, Cal., for defendants-appellees.

Before WRIGHT, HUG and FLETCHER, Circuit Judges.

FLETCHER, Circuit Judge:

Hunt-Wesson Foods, Inc. (Hunt) appeals from the dismissal of those portions of its complaint that charged Ragu Foods, Inc. (Ragu) and its parent, Chesebrough-Pond's, Inc., with conduct other than price discrimination that violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976). Hunt also appeals from the district court's grant of summary judgment in favor of defendants with respect to alleged "primary line" price discrimination that Hunt charged violated both sections 1 and 2 of the Sherman Act and section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a) (1976). This court has jurisdiction under 28 U.S.C. § 1291 (1976). We reverse the dismissal of Hunt's Sherman Act claims and affirm the grant of summary judgment.

## I

### THE COMPLAINT

Hunt's complaint alleges essentially that Ragu sought to impede Hunt's introduction of a new product, "Hunt's Prima Salsa Spaghetti Sauce," in furtherance of Ragu's actual or attempted monopolization of the prepared spaghetti sauce market. Hunt contends that when it attempted to test-market Prima Salsa, Ragu, with intent to preclude Hunt from the market, gave discounts on its regular spaghetti sauce in the test markets, precipitously introduced its own comparable product, "Ragu Extra Thick and Zesty Spaghetti Sauce," and engaged in various acts of unfair competition. Hunt alleges that Ragu violated section 2 of the Sherman Act by unilaterally attempting to monopolize, actually monopolizing, and conspiring with its parent corporation to monopolize the spaghetti sauce market. Hunt further alleges that the discriminatory pricing violated section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, which prohibits discriminatory pricing "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce . . . ." Hunt also contends that Ragu conspired with Chesebrough-Pond's to restrain trade in violation of section 1 of the Sherman Act. Finally, Hunt joined a pendent claim based upon defendants' alleged violation of the state law of unfair competition.

Hunt's antitrust, price discrimination, and unfair competition claims are predicated on the following allegations summarized from the complaint. Ragu's spaghetti sauce has, since at least 1972, outsold all other brands combined in the United States. Ragu's share of national sales of prepared spaghetti sauce was 61.4 per cent in 1973, and the share rose to 65.5 per cent in 1975. In late 1973, Hunt decided to enter the prepared spaghetti sauce market. It developed a spaghetti sauce, "Prima Salsa," that differed from Ragu's in that it was thicker and spicier. In August 1975, Hunt test-marketed Prima Salsa in two metropolitan markets: the Syracuse-Buffalo area of New York and the Cincinnati-Dayton area of Ohio.

The amount of shelf space retailers give to spaghetti sauce and the number of brands they carry are limited. Hunt intended to obtain shelf space for Prima Salsa on the basis of the distinctiveness of the sauce, packaging, label, and advertising. It engaged in expensive marketing activities designed to differentiate Prima Salsa from Ragu's product on the basis of consistency and taste. As part of this campaign, Hunt developed a label that described the product as "Extra Thick and Zesty." The test marketing continued, as planned, until Hunt put Prima Salsa into nationwide distribution in August 1976.

Ragu responded by engaging in "price related" and "non-price related" activities. Beginning in August 1975, Ragu selectively granted both promotional allowances (which, in effect, were price reductions) and introductory discounts [1] in the test market

---

1. The promotional allowances and introductory discounts complained of apparently involved only Ragu sauces in existence prior to the introduction of Ragu Extra Thick and Zesty.

areas where it was threatened by Hunt. The non-price related activities concerned Ragu's introduction of its own thicker and spicier spaghetti sauce, Ragu Extra Thick and Zesty. Hunt alleged that Ragu did the following:

1. Precipitously announced plans to market Ragu Extra Thick and Zesty in June 1976, shortly before Hunt was scheduled to begin its national promotion;

2. Appropriated the phrase "thick and zesty," thus impeding consumer identification of the phrase with Hunt's product;

3. Copied a figure used in one of Hunt's advertising layouts (a spoon pouring sauce over spaghetti) for use in a Ragu national advertisement;

4. Labelled the Ragu sauce to conceal that it was actually thickened by starch, rather than long simmering;

5. Appropriated Hunt's creativity and preparatory work and derived the benefit from investments made by Hunt in product development, test marketing, distinctive packaging, advertising, and promotion;

6. Precipitously released the new product;

7. Rendered Hunt's investment in product packaging, promotion, and advertising worthless;

8. Preempted shelf space and past and future sales; and

9. Created confusion and deception as to the source, quality, and nature of Ragu's new sauce.

## II

### PROCEEDINGS BELOW

Ragu responded to Hunt's complaint by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). On December 16, 1976, the trial court denied the motion, but in the course of doing so effectively dismissed Hunt's Sherman Act monopolization and attempted monopolization claims. The court ruled that Hunt's allegation that Ragu held 65 per cent of the market was an insufficient allegation of market power on which to found a monopolization claim. The court noted that the complaint contained no allegations indicating that Ragu had the power to control prices or restrict competition. In addition, the trial court held that Hunt had failed to plead in its attempted monopolization claim that there was a dangerous probability that Ragu would succeed in monopolizing the market. The trial court also dismissed from consideration any claimed antitrust violation founded upon the non-price related activities, stating that even assuming a claim for unfair competition was sufficiently alleged, "it is not every act of unfair competition which constitutes the kind of predatory and anticompetitive conduct proscribed by the Sherman Act." Because the non-price related activities could not support a Sherman Act claim, the court ruled, any Sherman Act claim Hunt had would rest upon its ability to establish substantive violations of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act. In sum, the trial court boiled down Hunt's allegations of Sherman Act and Robinson-Patman Act violations to a primary line price discrimination claim in which injury to competition is said to result from geographical price discrimination.

Having thus succeeded in narrowing the scope of the lawsuit, Ragu moved for summary judgment on the remaining claims. The trial court granted the motion. The court found that the introductory discounts were de minimis. With respect to the promotional allowances, the court found that some allowances had been offered in the test markets that had not been offered elsewhere but decided, apparently, that the allowances were not price reductions and thus could not constitute price discrimination. The court concluded that the plaintiff had failed to make a sufficient showing of a violation of the Robinson-Patman Act or of either section 1 or 2 of the Sherman Act. The court dismissed the antitrust portion of

Hunt's complaint with prejudice and then dismissed the pendent claim of unfair competition for lack of jurisdiction.

## III

### ISSUES PRESENTED

The following issues are presented with respect to the dismissal of portions of Hunt's complaint:

1. Is an allegation of a 65 per cent market share, without more, a sufficient pleading of market power in a section 2 monopolization claim?

2. Must a plaintiff plead facts demonstrating a "dangerous probability of success" to sustain an attempted monopolization claim?

3. Could Hunt, within the context of the complaint, prove any state of facts that would render the non-price related activities in violation of the Sherman Act?

With respect to the grant of summary judgment, the only issue is whether Hunt's affidavits, taken with its pleadings, placed in issue facts which, if established to the satisfaction of the trier of fact, would constitute price discrimination proscribed by either the Robinson-Patman Act or the Sherman Act.

## IV

### SUFFICIENCY OF THE COMPLAINT

■ Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only that the plaintiff make " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Dismissal of a complaint under rule 12(b)(6) for failure to state a claim is proper only if it is clear that the plaintiff could prove no set of facts within the framework of the complaint that would entitle him to relief. *Id.* at 45–48, 78 S.Ct. at 101–103; *California Dump Truck Owners Ass'n v. Associated General Contractors of America, San Diego Chapter, Inc.*, 562 F.2d

607 (9th Cir. 1977). There is no special rule requiring more factual specificity in antitrust pleadings. *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers*, 542 F.2d 1076, 1082 (9th Cir. 1976), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977); *Walker Distributing Co. v. Lucky Lager Brewing Co.*, 323 F.2d 1, 3 (9th Cir. 1963). Accordingly, with respect to each dismissed portion of the complaint, we must ask whether Hunt could show any set of facts, consistent with the allegations of its complaint, that would constitute a violation of the antitrust laws.

### A. Pleading Market Power in a Section 2 Monopolization Claim

■ In general, a section 2 monopolization claim consists of three elements:

1. possession of monopoly power in the relevant market;

2. willful acquisition or maintenance of that power; and

3. causal "antitrust injury."

*California Computer Products v. International Business Machines Corp.*, 613 F.2d 727, 735 (9th Cir. 1979). In its order of December 16, the trial court held that the allegation that Ragu had a 65 per cent market share was an insufficient pleading of market power.

■ Whether monopoly power exists depends on a variety of factors. Market share is evidence from which the existence of monoply power may be inferred, but it should not be equated with monopoly power. Blind reliance upon market share, divorced from commercial reality, could give a misleading picture of a firm's actual ability to control prices or exclude competition. Thus, the court in *General Communications Engineering, Inc. v. Motorola Communications & Electronics, Inc.*, 421 F.Supp. 274, 291–92 (N.D.Cal.1976), found that the competitive nature of the industry prevented a finding of monopoly power despite evidence of a market share of 64 to 71 per cent. On the other hand, market shares on the order of 60 per cent to 70 per cent have supported

findings of monopoly power. *See Greyhound Computer Corp. v. International Business Machines Corp.*, 559 F.2d 488 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976).

While market share is just the starting point for assessing market power, we think that market share, at least above some level, could support a finding of market power in the absence of contrary evidence. Where such an inference is not implausible on its face, an allegation of a specific market share is sufficient, as a matter of pleading, to withstand a motion for dismissal. With nothing but Hunt's complaint before us, we cannot say that allegations that Ragu had a 65 per cent market share, and that the share was increasing, could not under any market conditions provide a basis for inferring the requisite market power. *See Brager & Co. v. Leumi Securities Corp.*, 429 F.Supp. 1341, 1347 (S.D.N.Y.1977); *Fox Chemical Co. v. Amsoil, Inc.*, 445 F.Supp. 1355, 1360 (D.Minn. 1978).[2]

B. *The Role of "Dangerous Probability of Success" in an Attempt to Monopolize Claim*

The trial court dismissed Hunt's section 2 attempted monopolization claim because Hunt had not alleged that there was a dangerous probability that Ragu would have succeeded in establishing a monopoly. Whether "dangerous probability of success" must be alleged and proved in an attempt to monopolize claim has been controversial, even within this circuit, since this court's decision in *Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).

*See* III P. Areeda & D. Turner, *Antitrust Law* 336–39 (1978); Cooper, *Attempts and Monopolization*, 72 Mich.L.Rev. 373, 420 n.1 (1974).

To understand the reason for requiring proof of dangerous probability of success, one must keep in mind the central purpose of the attempt offense—to discourage unilateral activity that poses a threat to competition and that, if left alone, could result in the acquisition of monopoly power. P. Areeda & D. Turner, *supra*, at 312. The focus must be on the danger to competition posed by the activity and by the actor. It is apparent that each situation will present different problems that mandate a flexible approach toward the "mix" of conduct, actor, and market conditions that make up the offense. In some cases of clearly exclusionary conduct, the conduct itself, along with the exclusionary intent that can be inferred from it, poses such a danger to competition that it may be condemned regardless of the market power of the actor. In a sense, the conduct carries an inherent "dangerous probability of success." Such clearly exclusionary behavior, even though it poses no immediate measurable danger to the market, presents the potential for mischief. To the extent that such conduct inevitably harms competition, there is little reason to tolerate it.

On the other hand, in circumstances involving ambiguous conduct, the requisite degree of danger may not exist in the absence of appreciable market power because market power increases the potential for harm. What may be legal for the company lacking substantial market power may be illegal for the firm with such power. And where the conduct is ambiguous, the market power of the firm may help clarify the intent of the actor.

---

2. The minimum standard was almost certainly not met in *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968 (8th Cir. 1968), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969), where the court dismissed a complaint that alleged that Kroger, a grocery store chain controlling 8 per cent of the grocery market, was attempting to monopolize the sale of milk to groceries by building a dairy processing plant capable of supplying 20 per cent of that market. The court stated in categorical terms that a 20 per cent market share would not be sufficient to allow a firm to control prices or exclude competition.

 The Ninth Circuit cases discuss these principles within the doctrinal framework of specific intent and conduct. All the cases are consistent in saying that specific intent and anticompetitive conduct are essential elements of the attempt claim. *See, e. g., Greyhound Computer Corp. v. International Business Machines Corp.,* 559 F.2d 488, 504 (9th Cir. 1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 669 (9th Cir. 1980). Specific intent to monopolize will normally be proved by inference from conduct. *California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727, 736–37 (9th Cir. 1979). Whether or not market power is considered a "separate" element of the attempt action,[3] the existence of market power is relevant to drawing the inference of specific intent from conduct, except where the conduct is clearly threatening to competition. *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d at 669; *California Computer Products v. International Business Machines Corp.,* 613 F.2d at 737; *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 853–54 (9th Cir. 1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Greyhound Computer Corp. v. International Business Machines Corp.,* 559 F.2d 488, 504–05 (9th Cir. 1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *Knutson v. Daily Review, Inc.,* 548 F.2d 795, 813–14 (9th Cir. 1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1276 (9th Cir. 1975).

 We hold that Hunt has adequately pleaded the necessary elements of its attempt to monopolize claim. Hunt alleged that Ragu engaged in acts resulting in anticompetitive effects, "with the specific intent to eliminate plaintiff and others as competitors . . . all with the intent of keeping or forcing plaintiff out of the business . . . and all with the purpose and effect of obstructing, restraining and excluding competition by the plaintiff and others." Hunt's complaint described in detail the allegedly anticompetitive acts. We recognize that the specific acts detailed may be beyond the reach of the antitrust laws because they harm not competition but individual competitors. Hunt, however, has alleged that Ragu possessed a 65 per-cent market share. As we have explained, this may provide a basis for inferring that Ragu possessed monopoly power. Page 924, *supra.* It is not inconceivable that such acts could harm competition when undertaken by a firm with market power. The allegations are therefore sufficient to withstand a motion to dismiss.

## C. Dismissal of the Conspiracy to Monopolize Claim

 The district court did not specifically refer to Hunt's section 2 conspiracy claim in its December 16 order, but apparently intended to include it in the court's dismissal of other counts for failure to state a claim. A conspiracy to monopolize action is similar in its essence to an attempt to monopolize action. Both focus on specific intent to monopolize and anticompetitive acts designed to effect that intent, although in the conspiracy claim the act may be no more than the agreement itself. As we stated above with respect to Hunt's attempt claim, no particular level of market power or "dangerous probability of success" has to be alleged or proved in a conspiracy claim where the specific intent to monopolize is otherwise apparent from the character of the actions taken. *Lessig v. Tidewater Oil Co.,* 327 F.2d 459, 474 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *Salco Corp. v. General Motors Corp.,* 517 F.2d 567, 576 (10th Cir. 1975); *United States v. Consolidated Laundries*

---

**3.** The fact that dangerous probability of success is considered a separate element does not necessarily mean that the plaintiff must show market power. The probability of success may be established by direct proof, or it may be inferred from predatory conduct and specific intent to control prices or exclude competition. *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 853 (9th Cir. 1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978).

*Corp.*, 291 F.2d 563, 573 (2d Cir. 1961). *But see V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc.*, 403 F.Supp. 643, 651–52 (E.D.Pa. 1975), aff'd, 565 F.2d 154 (3d Cir. 1977). But where actions are ambiguous, the existence and extent of market power may make the inference of specific intent from conduct more or less plausible. *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*, 510 F.2d 1140, 1144 (2d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975); *Optivision, Inc. v. Syracuse Shopping Center Assocs.*, 472 F.Supp. 665, 680 (N.D.N.Y.1979); *Brager & Co. v. Leumi Securities Corp.*, 429 F.Supp. 1341, 1346 (S.D.N.Y.1977). Hunt alleges that Chesebrough-Pond's and Ragu conspired to monopolize with the requisite specific intent and in addition alleges that Ragu had market power. This is sufficient to withstand a motion to dismiss.

### D. Dismissal of Any Claim Based on the Non-Price Related Activities

In its December 16 order, the district court dismissed any consideration of the non-price related activities with the following language:

The allegations that defendants copied and appropriated plaintiff's idea for a "new" spaghetti sauce, appropriated plaintiff's name "extra thick and zesty," and copied plaintiff's advertising, do not state a claim for antitrust violations, if any claim at all. Assuming, *arguendo*, a claim for unfair competition is sufficiently alleged, it is not every act of unfair competition which constitutes the kind of predatory and anticompetitive conduct proscribed by the Sherman Act.

Ragu argues that its conduct, even if sufficient to make out an unfair competition claim under state law, was in all respects procompetitive and therefore could never support Hunt's Sherman Act claims. Ragu seeks to distinguish conduct which might constitute unfair competition but furthers competition from conduct which because of its essentially predatory character is anticompetitive. While Ragu's distinction may have merit in the abstract, the question presented here is whether any market could exist, consistent with the allegations of Hunt's complaint, in which Ragu's non-price related activities could have contributed to an anticompetitive effect. Assuming the existence of some market power, Ragu's conduct could have made Hunt's entry into the market more difficult and costly, to the detriment of competition generally. *See Power Replacements Corp. v. Air Preheater Co.*, 356 F.Supp. 872, 897 (E.D.Pa.1973). Of course, it is free and open competition that the Sherman Act protects, and not any right of one competitor to be free of rough treatment at the hands of another. *See Northwest Power Products, Inc. v. Omark Indus., Inc.*, 576 F.2d 83, 89–90 (5th Cir. 1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). If it is shown in subsequent proceedings that Ragu's actions did not harm competition,[4] then Hunt's remedy, if any, does not lie in federal antitrust law.

For these reasons, the trial court's dismissal from consideration of any section 1[5] or section 2 claims based on the non-price activities must be reversed.

4. As might be the case, for example, if Ragu demonstrates that it lacked market power.

5. Ragu contended at oral argument that Chesebrough-Pond's and Ragu are incapable of combining and conspiring with each other within the meaning of section 1. In general, affiliated corporations cannot conspire with each other where they function as a single economic unit. *Las Vegas Sun, Inc. v. Summa Corp.*, 610 F.2d 614, 617–18 (9th Cir. 1979), cert. denied, —— U.S. ——, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980); *Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451, 455–58 (9th Cir. 1979); *Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620, 625–26 (9th Cir. 1977); *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 801–02 (9th Cir. 1976), cert. denied, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). Resolution of the question hinges on the particular facts involved, such as unity of control and the existence of real or apparent competition between the related corporations. Such factual questions are not suited to resolution on the face of the complaint.

In the event this issue becomes material in the proceedings on remand, we note that a finding of incapacity to combine and conspire under section 1 would mandate the same result

## V

## SUMMARY JUDGMENT

■ In its December 16 order, the trial court, after dismissing all claims based on the non-price related activities, ruled that Hunt's ability to establish Sherman Act violations predicated upon the alleged acts of price discrimination depended upon its ability to establish substantive violations of section 2(a) of the Robinson-Patman Act. The court subsequently granted Ragu's motion for summary judgment on both the Robinson-Patman Act and Sherman Act claims. We think the trial court properly found that Hunt failed to raise a material question of fact with regard to the existence of price discrimination and therefore affirm the grant of summary judgment as to both the Robinson-Patman Act claim and the Sherman Act claim.[6]

Hunt complains that Ragu practiced price discrimination in two ways. First, Hunt alleges that Ragu offered promotional discounts in Hunt's test markets that overcompensated retailers for promotional services, thus effecting a price reduction. Second, Hunt alleges that Ragu offered one-time-only introductory price discounts on specific Ragu products to retailers within the test markets. Hunt alleges that in both cases some of the price reductions occurred in the test markets only. The parties do not dispute that Ragu's list prices were uniform nationwide.

### A. Promotional Allowances

In support of its motion for summary judgment, Ragu submitted affidavits from Charles E. Kiernan, its product manager for spaghetti sauce products. Hunt responded with an affidavit from Stephen G. Rothschild, Hunt's Director of New Products. The affidavits agreed on the basic structure of Ragu's promotional allowances. A seller gives a promotional allowance when he allows a price discount or makes a direct payment to a purchaser in return for the purchaser's provision of promotional or advertising services. In theory, the allowance is not a price reduction because the seller is merely paying the buyer for services the buyer is performing. It is conceded that Ragu offered three promotional discounts in the test markets that it did not extend to areas outside those markets.

The affidavits disagreed, however, over how the allowances worked in practice. Rothschild detailed several ways in which buyers could have been overcompensated, while Kiernan averred that buyers had not been overcompensated. The district court granted Ragu's motion to strike, among other things, those portions of Rothschild's affidavit dealing with promotional overpayments, on the grounds that the statements were speculative, conclusory, and unqualified opinion testimony. We agree. Rothschild gave no indication that he had any personal knowledge of the behavior of Ragu's customers. It appears from the face of his affidavit that Rothschild has simply drawn inferences about what *could have happened* from the terms of the allowances. In contrast, Kiernan, Ragu's employee in charge of the promotions, gave a detailed statement based on his personal knowledge demonstrating why customers were not overcompensated. We think that when confronted with Kiernan's affidavit, Hunt was obliged to come forth with more than speculation in order to raise a question of material fact. *Mutual Fund Investors v. Putnam Management Corp.*, 553 F.2d 620, 624 (9th Cir. 1977).

It is no answer for Hunt to argue that summary judgment should not have been

---

with regard to the section 2 conspiracy to monopolize claim.

**6.** Hunt argues that the trial court improperly judged the Sherman Act claim based on acts of price discrimination by the same standards applicable to its Robinson-Patman Act claim. We need not decide whether a claim based on price discrimination is defined precisely the same under both the Sherman Act and the Robinson-Patman Act, *see Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 855 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978), because Hunt failed to raise a material question of fact about the existence of discrimination of *any* sort.

granted before discovery. Hunt had available to it the machinery for obtaining information through a proper application under rule 56(f) of the Federal Rules of Civil Procedure.[7] This Hunt failed to do.

## B. Introductory Discounts

The introductory discounts of which Hunt complains are one-time discounts on a particular product, given to merchants who had not previously stocked the item.[8] The trial court ruled that the discounts were not prohibited by the Robinson-Patman Act because they were *de minimis.* We need not address the question whether the discounts were so negligible as to be *de minimis,* for Hunt has failed to raise any question of fact with regard to the existence of geographical price discrimination.

Kiernan made detailed statements, based on his personal knowledge and supported by documentary evidence, explaining that the introductory discounts were equally available to any qualified purchaser in any market. Hunt has not come forth with facts to dispute Kiernan's explanation.[9]

7. Rule 56(f) provides:
 *When Affidavits are Unavailable.* Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

8. Hunt argues that although introductory discounts are "normally" used to obtain initial penetration of a geographical area for a new product, Ragu discounted an established product to grocers who were not yet purchasing it. Ragu offers a somewhat different view of its discounting practices. According to Kiernan's affidavit, grocers purchasing a particular product for the first time were given a one-time discount. In any event, it is irrelevant whether Ragu's introductory discount plan followed the trade norm.

9. Kiernan stated in his initial affidavit that "Ragu since at least 1973 has offered in all markets a standard introductory discount to every new purchaser . . . ." and attached a number of authorizing bulletins that show all

## VI

## CONCLUSION

In summary, we hold that the trial court improperly dismissed those portions of Hunt's Sherman Act claims based on actions other than price discrimination. This ruling necessitates the reversal of the trial court's dismissal of Hunt's pendent unfair competition claim. Finally, we hold that the grant of summary judgment on Hunt's Robinson-Patman Act claim and its Sherman Act claims (insofar as they are based on acts of price discrimination) was proper because Hunt failed to raise material questions of fact with regard to the existence of price discrimination. We remand for further proceedings consistent with this opinion.

of the discounts that were offered in the test markets. He stated that each introductory discount was evidenced by an authorizing bulletin, which was prepared to instruct Ragu's accounting personnel and billing computer of the details of the sale. Hunt responded with the unsubstantiated statement in its Memorandum of Points and Authorities in Opposition to the Motion for Summary Judgment that although the introductory discounts may have been offered in all markets, they nevertheless were not offered *simultaneously* in all markets. Kiernan responded in his second affidavit that the discounts were available to "every new purchaser wherever located," and he attached a sample of 20 out of 150 discount bulletins relating to discounts offered outside the test markets. Hunt claims in its brief that the bulletins show that the discounts were discontinuous and not simultaneously available in all cities but offers nothing to contradict Kiernan's statements. According to Kiernan's uncontroverted statement, each discount was evidenced by a separate bulletin. In other words, the bulletins necessarily reflect that introductory discounts were offered in different locations during different time periods, because the bulletins were prepared for individual purchasers.