**OAHU GAS SERVICE, INC.,
Plaintiff-Appellee,**

v.

**PACIFIC RESOURCES INC., Gasco,
Inc., Defendants–Appellants.**

No. 86–2250.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 10, 1987.

Decided Feb. 1, 1988.

William S. Boyd (argued), Brobeck, Phleger & Harrison (John E. Sparks, William J. Taylor and Stephen L. Meagher, Brobeck, Phleger & Harrison, San Francisco, Cal., and John A. Hoskins, Reinwald, O'Connor, Marrack & Hoskins, Honolulu, Haw., on the brief), San Francisco, Cal., for defendants-appellants.

Maxwell Blecher (argued), Blecher, Collins & Weinstein (Norman Pine and Ann I. Jones, Blecher & Collins, P.C., Los Angeles, Cal., on the brief), Los Angeles, Cal., for plaintiff-appellee.

Before WRIGHT, FARRIS and THOMPSON, Circuit Judges.

## ORDER

The Opinion filed October 9, 1987 and amended November 27, 1987 is withdrawn.

## OPINION

FARRIS, Circuit Judge:

Oahu Gas Services, Inc., sued Pacific Resources, Inc., under Section 2 of the Sherman Act for monopolization and attempted monopolization of propane sales in Hawaii. Oahu Gas alleged that Pacific Resources' unlawful conduct included: (1) a decision in 1974 not to begin producing propane and (2) a campaign in 1982 to force Oahu to lower prices by offering sham cut-rate contracts to Oahu's customers. After trial, a jury found in favor of Oahu and awarded treble damages of $4,963,998.00. Pacific Resources appeals the denial of its motion for judgment notwithstanding the verdict.

## BACKGROUND

Until 1972, Gasco, a subsidiary of Pacific Resources, was the sole retail seller of propane gas in Hawaii. It received virtually all its propane from Chevron, which operated the only propane refinery in Hawaii. In 1972, Oahu Gas Service was formed and began selling propane on Oahu. Its propane supplies also came from Chevron. Beginning in 1973, the federal government controlled the price and allocation of propane. The base period for determining allocations was May 1972, before Oahu Gas had begun business. Oahu therefore had to apply to the Department of Energy for a "base period volume" of propane that Chevron would be required to supply.

During the energy crisis, price controls on domestically produced propane led Chevron to produce the minimum required by the Department of Energy. Gasco bought increasing amounts of propane from foreign suppliers. During these years, Oahu Gas repeatedly applied to the Department of Energy for larger allocations of propane. Gasco opposed these applications because giving Oahu more low-cost domestic propane would require Gasco to buy more expensive foreign propane, thus increasing Oahu's cost advantage. The Department of Energy denied Oahu's requests until, in July 1979, the Department increased Oahu's share of domestic propane on the condition that Oahu pay Gasco $163,108.00 to offset some of Gasco's additional costs for importing more foreign propane.

One basis for Oahu's Sherman Act allegations was the decision of Hawaiian Independent Refinery, Inc.—a subsidiary of Pacific Resources—not to produce propane in the 1970s. Hawaiian Independent Refinery

began operating a petroleum refinery in 1972, producing chiefly military fuels. In early 1973, before price controls went into effect, Hawaiian planned to modify its refinery to permit production of propane and gasoline. The plans assumed that the modifications could be completed by 1976 and that Gasco would be the chief customer for propane. Under price controls, however, Hawaiian's propane would have had the same ceiling price as Chevron's. Thus the refinery expanded only to permit gasoline production, which began in May 1975. After price controls ended in 1981, the refinery was modified to produce propane. It has sold propane to Gasco and to Aloha Gas, a small new propane distributor. It has expressed a willingness to sell propane to Oahu Gas.

Another basis for Oahu's allegations was Gasco's marketing program in 1982. During the energy crisis, demand for propane fell as consumers turned to alternative energy sources. With the end of regulation in 1981 and the beginning of propane production at Hawaiian's refinery in 1982, propane supplies became more plentiful. Gasco began a marketing program in 1982 that included offers of low-cost longterm contracts to large-volume purchasers, both its own customers and customers served by Oahu Gas. The prices offered were above Gasco's average total cost of supplying propane, but Oahu asserted at trial that the offers were "shams," designed to force Oahu to cut prices to its own customers. Oahu did cut prices to those customers, resulting in such low profits, Oahu claims, that it was nearly put out of business. None of Oahu's customers accepted Gasco's offers. Several of Gasco's own customers accepted the offers. In June 1982, Oahu sought and obtained an injunction prohibiting Gasco from soliciting Oahu's customers while they were under contract to Oahu.

The record indicates several uncontroverted facts relating to the relevant market and market shares of Gasco and Oahu Gas. Before Oahu began business in 1972, Gasco served 100% of the propane market on Oahu and in the "outer islands." After Oahu Gas began operating, Gasco's share

of the market on Oahu declined steadily. By 1983, before the trial, Oahu sold about 30% of the propane in Oahu. Oahu Gas dominated sales to high-volume commercial and industrial users on Oahu, supplying 78% of that sub-market in 1985. Gasco supplied about 20% of those customers; Aloha Gas supplied the remaining 2%. Oahu Gas did not sell propane in the outer islands.

Oahu's claims of monopolization and attempted monopolization went to trial in 1985. The jury returned a verdict in favor of Oahu and found treble damages of $4,963,998.00. The court also awarded attorneys fees of $873,324.00.

## DISCUSSION

### I. MONOPOLY POWER IN THE RELEVANT MARKET

The offense of monopolization under Section 2 of the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *see also Catlin v. Washington Energy Co.*, 791 F.2d 1343, 1347 (9th Cir.1986) (making explicit as a third factor the implicit requirement of "causal antitrust injury"). We review first the jury's finding that Gasco possessed monopoly power in the Hawaiian propane market from 1972 to 1983, the relevant period for purposes of Oahu's allegations of exclusionary conduct. Our previous decisions establish that both market definition and market power are essentially questions of fact. *See, e.g., Twin City Sportservice v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir.1982) ("The definition of the relevant market is basically a fact question dependent upon the special characteristics of the industry involved . . ."); *Greyhound Computer Corp. v. International Business Machines Corp.*, 559 F.2d 488, 496–97 (9th Cir.1977), *cert. denied*, 434 U.S. 1040,

98 S.Ct. 782, 54 L.Ed.2d 790 (1978) (reviewing the jury's finding of monopoly power for sufficiency of the evidence). We thus review the evidence on these factual issues in the light most favorable to Oahu and draw all reasonable inferences in its favor, for this is an appeal from the denial of a motion for judgment notwithstanding the verdict. *See Peterson v. Kennedy,* 771 F.2d 1244, 1252 (9th Cir.1985), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986) ("A JNOV is improper if reasonable minds could differ over the verdict").

### A. *Market Definition*

■ A determination of the relevant market typically requires an inquiry into the nature of the product, *see, e.g., United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956), and the geographical area of effective competition. *United States v. Grinnell,* 384 U.S. at 575–76, 86 S.Ct. at 1706. Although product definition and geographical definition are theoretically separable inquiries, in this case they are intimately intertwined. Oahu asks us to affirm the jury's finding that the relevant market was inclusive of all propane sales in Hawaii. Gasco, on the other hand, argues that the relevant market was limited to high-volume industrial and commercial users of propane. These high volume users, the evidence suggested, were located either primarily or exclusively in Oahu. The arguments made at trial and pressed before us, though not extensive on the issue of market definition, make clear that the crux of the parties' dispute is product definition rather than geographical definition. We thus focus on product definition first, keeping in mind the importance of delineating the geographical market as well for its bearing on Gasco's market power.

■ The issue of product definition, though always an inexact science often requiring distinctions in degree rather than kind, *see* 2 P. Areeda & D. Turner, Antitrust Law ¶ 518 (1978), is especially complicated in this case. During the course of the litigation, three plausible product markets have been suggested by the parties as the proper subjects of focus for purposes of our antitrust inquiry. On the broad end of the scale, it was suggested by Gasco at trial and in its motions before the district court, though not before us, that the jury erred by failing to include in its product definition numerous alternative energy sources that were said to constrain significantly any potential control over prices or competition in the propane market. A second possible delineation of the product market, the one with an intuitive if not necessarily a strong economic appeal, is all propane distribution in Hawaii; this is the market definition that the jury adopted. A third approach, first suggested by Gasco before the district court in its brief in support of its motion for a new trial and renewed on appeal, would be to define the relevant market in a relatively narrow fashion, limiting it to high-volume commercial and industrial users of propane.

Our review is limited, of course, to an assessment of the evidence in the light most favorable to Oahu. Thus, if the evidence was sufficient to allow a reasonable jury to define the relevant market for antitrust purposes in terms of propane distribution in Hawaii, we are required to accept the jury's fact-finding on this issue. *See Los Angeles Memorial Coliseum Commission v. National Football League,* 726 F.2d 1381, 1392 (9th Cir.), *cert. denied sub nom. National Football League v. Oakland Raiders, Ltd.,* 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984).

Unfortunately, a review of the evidence that was presented to the jury in this case does not shed considerable light on the proper market definition. The jury did hear testimony from Oahu's expert, Dr. Meier, to the effect that propane was the relevant market because conversion to alternative energy sources, such as electricity or heat pumps, would be too expensive for many propane users. This argument was made, of course, in response to Gasco's contention that the product market should have been defined *more* broadly than just propane, and we must view it in that light. It is clear from Dr. Meier's testimony, however, that his impression of

the constraints upon cross-elasticity of demand was more applicable to small residential users of propane than to high volume commercial buyers. Arguably, in responding to the argument for a broader product market, Dr. Meier may be said to have opened the door inadvertently to a logical inference in favor of a narrow market definition.

This narrow definition also finds support in other materials relied upon by Oahu. In its memorandum before the district court in opposition to Gasco's motion to set aside the verdict, Oahu made much of the testimony of Howard Lee that "once a house is gassed, it's gassed, probably for ten, twenty, thirty years and to change it back to electricity, financially it's not practical." There was also the testimony of Lambert Lui–Kwan, Oahu's Director of Sales, that Oahu did not want residential customers because it viewed their business as unprofitable, and that Oahu therefore referred inquiries about residential service to Gasco. As a result, Oahu Gas, by 1983, had come to dominate sales to high-volume commercial and industrial users on the island of Oahu but had no business among either residential users on Oahu or on the outer islands.

Had Gasco reinforced this testimony regarding the differences between residential and commercial use of propane with further evidence of the constraints upon which residential and commercial suppliers operate, it is possible that a reasonable jury would have had no alternative but to conclude that high-volume industrial sales were the relevant market in this case. Gasco did not do this, however, preferring instead to focus at trial upon the theoretical interchangeability between propane and other energy sources. Gasco made no effort at trial to distinguish between residential and commercial use of propane. Consequently, the question submitted to the jury with regard to product definition was limited to its assessing the evidence of user substitutes and deciding whether alternative energy sources significantly impacted upon propane distribution. Viewing the evidence from this perspective and in the light most favorable to Oahu, we can-

not say that the jury acted unreasonably in concluding that the relevant market included commercial and residential propane, but not other sources of energy such as electricity.

As to geography, this segment of the inquiry into market definition is clearly subsidiary to product definition. No effort was ever made, for example, to differentiate between commercial and residential propane sales on the island of Oahu on the one hand and propane sales on all the islands on the other. This is partly because commercial sales on the outer islands are negligible and partly because Oahu Gas sold only to commercial users on the island of Oahu. In either case, we are convinced, in part because of some of Gasco's own arguments, that the jury could reasonably have defined the geographical market for propane to include the outer islands. In contending that the ease of entry into the propane distribution business precluded its exercise of monopoly power, Gasco states, perhaps inadvertently: "The undisputed evidence surrounding [Oahu Gas]'s own entry into the propane business in 1972 demonstrated that [Pacific Resources] and Gasco had no power to exclude new entrants from selling propane *in Hawaii*." (Emphasis added). Gasco presented no evidence to the jury, nor to us, regarding transportation costs to the outer islands or other barriers between the island of Oahu and its smaller compatriots. Accordingly, we affirm the jury's definition of the geographical market to include all of Hawaii.

Our conclusion that the jury acted reasonably in its market definition is made with some questions as to whether the correct result was reached. These reservations might ordinarily give us pause, especially since our affirmance leads inexorably to the conclusion that Gasco wielded considerable power in the relevant market. *See* Section IB, *infra*. However, as our discussion of the second part of the test for monopolization demonstrates below, a finding of monopoly power has no bearing in this case on liability. We are therefore content to assume *arguendo* the existence of monopoly power, as we have done in

previous cases in which the other requirements for maintaining a Section 2 action were in doubt. *See, e.g., Transamerica Computer Co., Inc. v. International Business Machines Corp.*, 698 F.2d 1377, 1382 (9th Cir.1983), *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983); *California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 739 (9th Cir.1979).

### B. *Market Power*

The jury found that Gasco possessed monopoly power in the Hawaiian propane market. Our review of that finding is limited again to an assessment of the evidence in the light most favorable to Oahu. The evidence demonstrated that Gasco was the exclusive seller of propane to residential sellers on Oahu and on the outer islands. As a result of this dominance of certain parts of the market, Gasco's overall market share in the Hawaiian propane market was consistently above 68% from 1972 to 1983. The parties are essentially in agreement on the computations of Gasco's market share, which declined from a figure of 100% in 1972 to 95.5% in 1973, to 89.7% in 1974, to 69.6% in 1981, and finally to 68.2% in 1983. They disagree as to the legal conclusions that may be drawn from these statistics and other evidence. Oahu maintains that the evidence of Gasco's high market share and the lack of evidence of "meaningful entry" by other firms into the Hawaiian propane market from 1973 to 1984 support an inference of monopoly power. Gasco maintains that the evidence of its steadily declining market share during the relevant period, combined with what it contends is the absence of evidence in the record of barriers to entry or an ability on Gasco's part to control prices, precludes any finding that it possessed monopoly power.

Inquiries into the existence of monopoly power focus generally on a firm's ability to "control prices or exclude competition." *Greyhound Computer*, 559 F.2d at 496 (quoting *United States v. duPont*, 351 U.S. at 391, 76 S.Ct. at 1005). Although no single factor has been held determinative as to the existence of such power, inquiries in this area often depend heavily upon mar-

ket share and barriers to entry. *See Ball Memorial Hospital, Inc. v. Mutual Hospital Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir.1986). A firm with a high market share may be able to exert market power in the short run, but "[s]ubstantial market power can persist only if there are significant and continuing barriers to entry." 2 Areeda & Turner, *supra*, at ¶ 505; *accord Cargill Inc. v. Monfort of Colorado*, —— U.S. ——, 107 S.Ct. 484, 494 n. 15, 93 L.Ed.2d 427 (1986).

Keeping these factors in mind and viewing the evidence most favorably to Oahu Gas, we now address the parties' contentions. Oahu makes two arguments in support of the jury's finding of monopoly power. First, Oahu maintains that Gasco's high market share constitutes substantial evidence of monopoly power in spite of the evidence that that share constantly declined throughout the relevant period. Gasco argues, to the contrary, that the decline in its market share reflects an absence of monopoly power. Second, Oahu claims that the record, which reflects a virtual lack of entry by new firms into the Hawaiian propane market during the relevant time period, falls short of establishing the kind of competitive marketplace necessary to rebut the inference of monopoly power raised by Gasco's high market share. *See Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 925 (9th Cir.1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981).

If any conclusion may be gleaned from our prior decisions and those of the Supreme Court with regard to the first issue, it is that "market share is just the starting point for assessing market power." *Id.* A high market share, though it may ordinarily raise an inference of monopoly power, *see United States v. Grinnell*, 384 U.S. at 571, 86 S.Ct. at 1704, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors. By the same token, "A declining market share may reflect an absence of market power, but it does not foreclose a finding of such power." *Greyhound Computer*, 559 F.2d

at 496 n. 18 (citations omitted). Applied to this case, these principles lead to the conclusion that provided the jury heard substantial evidence of Gasco's high market share throughout the relevant period, the decline in its market share could not preclude a finding of monopoly power as a matter of law. If, however, the sole basis for the jury's finding was Gasco's high market share, this finding could not stand up in the face of a showing of low entry barriers or other significant constraints on Gasco's power over the marketplace.

Because the jury clearly heard substantial evidence relating to Gasco's market share, we proceed to the question of entry barriers, which are in dispute. Oahu maintains that the lack of entry by competitors into the market is sufficient to support an inference of high entry barriers. Gasco argues that the entry of Oahu and Aloha demonstrated that Gasco lacked the ability to control prices or to exclude new entrants.

We note preliminarily that both parties could theoretically be correct, if in fact Gasco lacked the power to exclude but there were external factors at work precluding entry into the market. In ordinary times, the failure of other firms to challenge Gasco on the outer islands and in the Oahu residential market might have supported an inference that Gasco had the power to exclude competitors or to control the price without much detailed inquiry. But because of the price controls that were in place from 1974 to 1981, Gasco clearly could not control the price and may not have had any control in the marketplace whatsoever. Thus, the question is whether Gasco could exclude rivals. In this regard, the jury learned of two entrants into the market from 1972 to 1984: Oahu and Aloha. Oahu entered the market in 1972 and consistently increased its market share thereafter, even during the period of price controls. Although this evidence of entry might tend to suggest that as of 1972, Gasco—which was dependent upon Chevron for propane supplies—could not ex-

clude rivals, the jury also considered evidence that the founder of Oahu, once an executive with Gasco, took some large accounts with him when he left Gasco. This evidence supports an inference that Oahu's success may have owed not so much to its competition on the merits in an open market as to the "insider" status of its founder, and does not negate the inference of high entry barriers. The second entrant, Aloha Gas, did win some accounts, but the evidence that that firm remained very small could reasonably preclude a decision that Aloha's entry reflected a breakdown of barriers to entry. Viewed in the light most favorable to Oahu, therefore, the evidence reasonably supports the conclusion that high barriers to entry existed in the Hawaiian propane market throughout the relevant time period.

■ The ultimate focus of our inquiry, however, is Gasco's power, not barriers to entry. Oahu points to no further evidence of Gasco's ability to exclude competition, and Gasco's arguments regarding price controls go to its ability to control price, not to exclude competitors. Consequently, the question before us is whether the jury could reasonably have found that a firm with a consistently high, albeit declining, market share in a market with high barriers to entry possessed monopoly power. The answer is yes. "While market share is just the starting point for assessing market power, we think that market share, at least above some level, could support a finding of market power in the absence of contrary evidence." *Hunt*, 627 F.2d at 925. Clearly, Gasco had a high market share, and the record does not permit us to infer "contrary evidence" that would negate a finding of market power. Hence, we affirm the jury's finding that Gasco possessed monopoly power.[1]

## II. ALLEGEDLY MONOPOLISTIC BEHAVIOR

The second element of monopolization under Section 2 of the Sherman Act is "the willful acquisition or maintenance of [mo-

---

**1.** Because we uphold the jury's finding of monopoly power, we need not consider the at-

tempted monopolization claim that was an alternative ground for the jury's verdict.

nopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell*, 384 U.S. at 570–71, 86 S.Ct. at 1704. The jury was asked to determine whether two courses of conduct by Gasco—a 1972 decision not to modify its refinery to permit propane production and a 1982 marketing campaign targeted at Oahu's clientele—constituted predation within the meaning of Section 2. The jury found in the affirmative on both counts. These determinations that specific conduct was anticompetitive in violation of the Sherman Act are questions of law that we review *de novo*. *Western Concrete Structures Co. v. Mitsui & Company (U.S.A.), Inc.*, 760 F.2d 1013, 1016 (9th Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985).

### A. *The Decision Not to Expand the Refinery*

The factual questions about Pacific Resources' allegedly exclusionary conduct in the early 70s were resolved at trial. It was clear that expanding the refinery to permit propane production would have been uneconomical under federal price controls in place at the time. It was also clear, however, that the decision not to produce propane had been based not only on economic factors but also on a desire to restrict the supply of propane potentially available to Oahu Gas. There is evidence in the record that the management of Pacific Resources feared that increasing the supply of propane in Hawaii would result in Oahu's getting more propane to sell, increasing its market share.

The desire to maintain or increase one's market share is not in itself an antitrust violation, of course. Nor is a decision to forego the production of propane an illegal act *per se*. But a monopolist must take care that otherwise lawful acts do not have anticompetitive effects because of its monopoly power.

■ We therefore reject Pacific Resources' broad contention that the antitrust laws may never impose duties on a monopolist to aid its competitors. Because of a monopolist's special position the antitrust laws impose what may be characterized as affirmative duties.[2] These duties are not absolute, however; they arise only when there is no justification for refusing to aid a competitor.

Where a monopolist's refusal to aid a competitor is based partially on a desire to restrict competition, we determine antitrust liability by asking whether there was a legitimate business justification for the monopolist's conduct. *See Aspen Skiing Co. v. Aspen Highland Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir.1986); *Drinkwine v. Federated Publications, Inc.*, 780 F.2d 735, 740 (9th Cir.), *cert. denied*, 475 U.S. 1087, 106 S.Ct. 1471, 89 L.Ed.2d 727 (1986).

■ The investment required of Pacific Resources to produce propane would have resulted in a negative return. In light of the then-existing price controls, it was not economically efficient for Pacific Resources to invest its resources in propane production. The decision to forego propane production did not exclude competition unnecessarily. The economic rationale, even if not the only rationale for the decision, excluded competition necessarily. Economic necessity distinguished this conduct from "willful acquisition or maintenance of [monopoly] power," *United States v. Grinnell*, 384 U.S. at 570–71, 86 S.Ct. at 1704, because it involved the "business acumen" that *Grinnell* specifically exempts from antitrust liability. *Id.*

■ The jury was instructed improperly. It was given an either/or choice: it could decide whether Pacific Resources' decision was based on economic motives *or* on a desire to maintain its market share.[3] It

---

**2.** For example, a ski resort with monopoly power was required to continue a marketing arrangement with its small neighbor where there was no legitimate business justification for discontinuing it, and the arrangement increased

competition and benefited consumers. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

**3.** The jury instruction on this issue was:

should have been instructed that the desire to maintain market power—even a monopolist's market power—cannot create antitrust liability if there was a legitimate business justification for refusing to produce propane.

Two lines of cases support our holding, though they are not directly controlling. A line of "product innovation" cases has consistently rejected antitrust liability for a monopolist's decision about when or whether to market new products. *See, e.g., Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir.1983), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984); *California Computer Products v. I.B.M. Corp.*, 613 F.2d 727 (9th Cir.1979); *see also GAF Corporation v. Eastman Kodak Co.*, 519 F.Supp. 1203, 1232 (S.D.N.Y.1981) ("[N]o court has yet found a monopolist's failure to market a product as satisfying § 2's conduct requirement.").

These cases, involving technological innovations, have held that the contested marketing decisions derived from "a superior product", and are therefore exempt from antitrust liability. Oahu Gas contends that such cases are inapposite, because the product at issue here is propane, hardly an innovation. But business acumen—the economics of timing a technological innovation —is also an aspect of these cases.

In *California Computer* we addressed specifically the issue of when a question of legitimate business purpose may go to a jury. Where IBM redesigned products in such a way that they were incompatible with a competitor's product, and where such design changes were justified "by reason of lower manufacturing cost and price or improved performance[,] ... [t]he reasonableness of IBM's conduct ... did not

present a jury issue." *California Computer Products*, 613 F.2d at 744.

Another line of cases that Oahu asks us to consider are "supply restriction" cases. It contends that Pacific Resources impermissibly sought to restrict the supply of propane in the Hawaiian Islands. *See, e.g., NCAA v. Board of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *Litton Systems, Inc. v. AT & T*, 700 F.2d 785 (2d Cir.1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir.1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). A theory of liability based on "supply restriction" must fail because Pacific Resources had no monopoly power over supplies of propane to Hawaii. Chevron produced all Hawaiian propane until 1982.[4] Contrary to Oahu's argument, the regulatory scheme in place in the 70s did not give Pacific Resources control over propane supplies. Oahu appealed to the Department of Energy for larger allocations of propane, and it was ultimately successful. Oahu's supply restriction theory cannot support antitrust liability for Pacific Resources' decision not to produce propane.

As a matter of law, we reverse the judgment of antitrust liability based on the refinery episode. Pacific Resources' decision to refrain from producing propane because it was not economically efficient is sufficient justification to preclude antitrust liability.

## B. *Gasco's 1982 Marketing Campaign*

The jury found that Gasco's 1982 campaign to offer cut-rate contracts to large propane purchasers was anticompetitive and predatory. Oahu defends this result on the ground that Gasco "made false 'of-

---

To sum up, you must determine whether PRI and Gasco maintained monopoly power in a relevant market by policies and conduct which were not legitimate business decisions but were instead designed primarily to further any domination of a relevant market....
You should seek to determine if the challenged conduct is supported by legitimate business reasons or whether it was a deliberate effort to injure a smaller rival which

caused defendants to sacrifice short-run benefits and consumer good will.

4. For this reason the "essential facilities" theory would not apply either. *See MCI Communications Corp. v. AT & T Co.*, 708 F.2d 1081, 1132 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (plaintiff must show control of the essential facility by a monopolist).

fers' without ever intending to compete for that business." Gasco disputes the finding of predatory conduct, arguing that it "had the absolute right to offer reduced prices so long as those offers were not shown to be below costs or shown to be predatory by clear and convincing evidence."

■ The parties' legal dispute may be summarized as follows. Neither party argues that Gasco set prices below its costs for the purposes of alluring Oahu's customers. The allegation of exclusionary conduct is not founded, therefore, on a theory of predatory pricing. Rather, Oahu's claim is that the insincerity or "sham" nature of Gasco's offers is sufficient to support a finding of predatory conduct.

The first question—whether the offers were "shams"—may be disposed of quickly. Reviewing the factual evidence in this appeal from a denial of a JNOV motion, we draw all reasonable inferences in Oahu's favor. The jury having returned a general verdict, we must presume it to have accepted Oahu's claim that Gasco's offer of cut-rate contracts were "shams." This finding was reasonably supported by the evidence. The jury heard evidence, for example, that most of the customers of Oahu Gas that Gasco solicited were known to have long-term contracts with Oahu that they would be unlikely to break. A Gasco employee testified, moreover, that when making an offer to an Oahu customer, she invited the customer to ask Oahu to meet or beat the offered price-cut. This testimony provides support for an inference that Gasco's true goal was not to attract customers, but to cut into Oahu's profits. Oahu also offered evidence, which we must presume the jury found credible, that Gasco did not make the same offers to its own customers as it did to Oahu's. This evidence, taken in full, is substantial enough to sustain Oahu's claim that Gasco's offer did not reflect a business risk on its part but only constituted a ploy to entice Oahu to lower *its* prices.

■ The harder question is whether this "sham" offer violated Sherman Act Section 2. Although the evidence supports the jury's finding of a predatory intent underlying Gasco's marketing campaign, the net result of this campaign seems to have been to increase competition in the market by inducing Oahu to lower its prices. Thus, we have before us a situation in which conduct with a predatory rationale had a procompetitive effect.

■ In order to sustain the jury's finding of predation, we would have to turn our back on a large body of case law holding that "[t]he test of willful maintenance or acquisition of monopoly power is whether the acts complained of unreasonably restrict competition." *Drinkwine v. Federated Publication, Inc.*, 780 F.2d 735 (9th Cir.1985), *cert. denied*, 475 U.S. 1087, 106 S.Ct. 1471, 89 L.Ed.2d 727 (1986). Here, there was no restriction on competition, let alone an unreasonable restriction. To be sure, Gasco's intent is not irrelevant to the inquiry. *See id.* (citing *Aspen Skiing*, 472 U.S. at 602–03, 105 S.Ct. at 2857) ("Intent must also exist but is subsumed in an analysis of the exclusionary conduct"). But a finding of anticompetitive intent will not sustain a Section 2 claim in the face of evidence of procompetitive effects.

This analysis should not be taken as an endorsement of Gasco's conduct. A campaign to harm or destroy rivals through deceptive marketing smacks of unfair competition, whose hallmark is harm to competitors. In seeking to induce Oahu's clients to abandon Oahu or to force Oahu to accept lower profits, Gasco engaged in activity that in some jurisdictions is actionable under the law of torts.

■ The goal of the antitrust laws, however, unlike that of business tort or unfair competition laws, is to safeguard general competitive conditions, rather than to protect specific competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Professors Areeda and Turner, in their discussion of the antitrust liability of firms that engage in unfair competition, stated in a passage of particular relevance here:

> [W]hile it may be a tort for a defendant to induce another to deal in violation of his contract with the defendant's rival, it should not be an exclusionary practice. Buying an employee away from a rival, for example, does not impair competition any more when that employee was under

a long term contract than when he was not. The competitive effect, if any, results from the transfer of resources or patronage away from the rival and to the monopolist.... If there is a tort, so be it. But antitrust law should not make liability depend upon the existence or nonexistence of contracts which do not affect the competitive results.

3 P. Areeda & D. Turner, Antitrust Law ¶ 7381 (1978).

We reverse the jury's finding of antitrust liability growing out of Gasco's 1982 marketing campaign. The undisputed evidence in the record that this campaign resulted in no anticompetitive effects precludes a finding of liability even though we accept the jury's conclusion that Gasco intended the campaign to harm Oahu and thereby to increase its market share.

## CONCLUSION

We reverse the jury's findings of antitrust liability with respect to both the refinery decision and the marketing campaign. Consequently, we need not address the parties' respective contentions on the subject of damages.

REVERSED.