**UNIVERSAL ANALYTICS, INC., a California corporation, Plaintiff,**

**v.**

**The MacNEAL–SCHWENDLER CORPORATION, a California corporation; Dr. Joseph Gloudeman, an individual; and Dr. Richard MacNeal, an individual, Defendants.**

**No. CV 87–06285 SVW(G).**

United States District Court, C.D. California.

March 2, 1989.

---

Bruce L. Gelb, Kenneth E. Chyten, Law Offices of William J. MacCabe, Torrance, Cal., for plaintiff.

Timothy M. Thornton, Robert E. Hinerfeld, Dennis Franks, Laurie L. Soriano, Dennis E. Kinnaird, Munger, Tolles & Olson, Los Angeles, Cal., for defendants.

## AMENDED ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WILSON, District Judge.

The Order dated December 4, 1988 and filed December 6, 1988 is hereby amended as follows:

In footnote 5, the citation to *United States v. Hernandez* is updated to include the denial of certiorari and now reads *United States v. Hernandez*, 829 F.2d 988, 993 (10th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1486, 99 L.Ed.2d 714 (1988). In footnote 14, the typographical error in the citation to *Albert Pick–Barth v. Mitchell Woodbury Corp.* has been corrected. In all other respects the December 4, 1988 Order remains unchanged.

This antitrust dispute involves two corporations engaged in the production and development of the Nastran computer software program, a system used in the aerospace industry. Each company markets its own version of this software package. While there apparently are significant design and operational differences between Plaintiff Universal Analytics, Inc.'s ("UAI") version of Nastran ("UAI/Nastran") and Defendant MacNeal Schwendler Corporation's ("MSC[1]") version, ("MSC/Nastran"), both programs perform similar functions thereby placing the

---

1. For purposes of this Order, all defendants will be collectively referred to as "MSC".

two corporations in direct competition for the Nastran market. MSC possesses approximately ninety percent of the Nastran market while UAI has only five percent of that market. Over a fifteen month period (Spring 1986—Summer 1987), five of the six Nastran technicians employed by UAI departed that company and went to work for MSC.[2] Given the complexity of the Nastran program, it takes several years before a technician can become proficient in this area. It is also apparent that there is a limited number of qualified Nastran programmers. Therefore, the departure of the five UAI Nastran technicians undoubtedly had a detrimental effect on UAI's ability to further develop its version of Nastran.

Faced with this depletion of its Nastran staff, and the concomitant effects on UAI's ability to compete in the Nastran market, UAI brought this lawsuit under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2.[3] First, UAI alleges that MSC obtained the five UAI employees by orchestrating a series of unlawful conspiracies in violation of Section 1. Second, UAI alleges that MSC unlawfully maintained its monopoly in the Nastran market, and/or attempted to obtain a monopoly in that market by engaging in a series of predatory acts, to wit, employee raiding, trade secret misappropriation, predatory pricing, and disparagement.

As will be developed fully below, UAI has failed to produce evidence sufficient to raise a genuine issue of material fact in support of its antitrust allegations.[4] It appears to the Court that UAI built this entire lawsuit around the otherwise innocuous departure of the five UAI employees, coupled with two MSC internal memoranda,

the first of which recommends the hiring of one of the five UAI employees based upon the endorsement of another former UAI employee, and because the hiring will "wound UAI again", and the second of which recommends the hiring of two UAI Nastran programmers because of their UAI acquired Nastran skills. Whatever the significance of the two memoranda, in the absence of evidence to support the serious antitrust claims set forth in the complaint, the Court must grant defendants' motion for summary judgment.

*Summary Judgment Standard*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

> Once the moving party meets its burden, Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which

---

2. The five employees are Nima Bakhtiary, Glen Hultgren, Raj Kansakar, Vinh Lam, and Hemant Patel.

3. The initial complaint contained eighteen counts, several of which were state law statutory and common law causes of action. On December 30, 1987, the Court dismissed the pendent common law claims and ordered plaintiff to amend the complaint. The instant complaint was filed on January 15, 1988 alleging only the *federal antitrust claims.* That same day, plaintiff commenced a companion state

court action alleging the state statutory and common law claims which were originally brought in this Court. The state action is, of course, based upon the same alleged facts as this action.

4. UAI at one point alleged that discovery was improperly restricted and that this impaired its ability to properly oppose this motion. However, on September 19, 1988 at a hearing on this motion, UAI waived all discovery objections.

that party will bear the burden of proof at trial.

*Id.* at 322, 106 S.Ct. at 2552. In opposing a motion for summary judgment, "the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, *'specific facts* showing that there is a genuine issue for trial.'" *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (emphasis in original) (quoting Fed.R.Civ.P. 56(e)). Although "[i]nferences must ... be drawn in the light most favorable to the nonmoving party," *T.W. Electrical,* 809 F.2d at 631, "there must be some limit on the extent of the inferences that may be drawn in the nonmoving party's favor from whatever 'specific facts' it sets forth." *Id.* Finally, the Court is mindful that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1).

*UAI's Section 1 Claims*

UAI alleges that MSC conspired to restrain trade in the Nastran industry and conspired to monopolize the Nastran market by engaging in three different conspiracies each of which was allegedly aimed at luring UAI's Nastran employees to MSC and thereby preventing UAI from competing in the Nastran market. Recently, in *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court set forth the standard which a party must meet in order to successfully oppose a summary judgment motion in a Section 1 conspiracy case: "To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." 475 U.S. at 588, 106 S.Ct. at 1357 (quoting *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984)). Under *Celo-*

*tex,* MSC must make a preliminary showing demonstrating the absence of a genuine issue of material fact regarding the existence of any conspiracy. At that point, UAI must make a showing sufficient to establish the existence of a conspiracy. Further, under *Matsushita,* UAI must present evidence that tends to exclude the possibility that the alleged co-conspirators acted independently. Each of the alleged conspiracies will be examined in turn.

### A. *Conspiracy Between MSC and the Employment Agencies*

■ UAI alleges that MSC conspired with various employment agencies in order to have these agencies target UAI as a source of potential MSC recruits and to eventually deplete UAI's Nastran staff. MSC met its burden of demonstrating the absence of any conspiracy by providing the following undisputed evidence. The only contract between any of the employment agencies and MSC was the MSC standard form written employment agency agreement that does not direct the employment agency to seek employees from any particular source. MSC never asked the employment agencies to approach any UAI employee about leaving UAI to join MSC. MSC never told any of the employment agencies the names of any of MSC's competitors or where the agencies might locate potential employees. In fact, on one occasion, when a representative of one of the employment agencies asked MSC for the identity of MSC's competitors, MSC refused to disclose that information. The only time MSC contacted the agencies other than communications regarding the initial agency agreement was to provide the agencies with information regarding job openings.

MSC also correctly pointed out that UAI presented no evidence that the employment agencies had any incentive to agree with MSC to target UAI employees. In addition, UAI presented no evidence that the employment agencies initiated contact with the five ex-UAI employees or that MSC ever told any of the employment agencies about UAI.

In the face of MSC's evidence, UAI relies upon the testimony of Thomas Betts, a representative of the employment agency that referred several of the employees to MSC. Mr. Betts stated that his agency viewed UAI and MSC as two companies engaged in a similar line of business and that it was the practice of the agency to refer employees to other compatible companies in their field of expertise. Mr. Betts' statement fails to make a showing sufficient to create a genuine issue as to the existence of any conspiracy and certainly does not exclude the possibility that MSC and the employment agencies were acting independently. Accordingly, under *Matsushita* and *Celotex*, summary judgment is mandated to the extent UAI's Section 1 claims are based on allegations of a conspiracy between MSC and the employment agencies.

### B. *Conspiracy Between MSC and Former UAI Employees While Those Employees Were Working at UAI*

■ UAI's second conspiracy allegation contends that MSC conspired with former UAI [now MSC] employees while those employees were working for UAI. The only basis for this conspiracy allegation is the declaration by present UAI employee John Jalil that former UAI [now MSC] employee Vinh Lam told Jalil while Lam was still at UAI that an unidentified MSC employee told Lam that MSC was interested in hiring Jalil. From this conversation, UAI argues that MSC conspired with UAI employees to lure UAI's Nastran staff to MSC.

As MSC pointed out in its reply papers, the above conversation is hearsay and is therefore inadmissible for purposes of this summary judgment motion.[5] Even assuming this evidence was admissible, it would not, alone, lead to any inference of a conspiracy. MSC never offered a position to Jalil. Further, the hearsay statement by

Lam was made nearly one year before Lam was hired by MSC and after MSC had rejected a prior job application submitted by Lam. These facts indicate that Lam lacked any motivation to conspire with MSC to injure UAI by recruiting UAI's Nastran development staff.

In any event, once again, UAI has failed to make a showing sufficient to establish a genuine issue as to the existence of a conspiracy between MSC and any UAI employee. Nor has UAI put forth evidence tending to exclude the possibility that MSC acted independently from the UAI employees. Summary judgment is therefore appropriate on this conspiracy claim. *See International Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 794–95 (2d Cir.) (reversing District Court's denial of defendants' motion for judgment notwithstanding the verdict where jury's finding of a conspiracy based on "impermissible speculation"), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987).

### C. *Conspiracy Between MSC and Former UAI Employees After Those Employees Began Working at MSC*

■ Finally, UAI alleges the existence of a conspiracy between MSC and the former UAI employees after those employees had commenced working for MSC. This allegation is inadequate as a matter of law because an agreement between an employer and its employees cannot constitute an actionable conspiracy for purposes of the Sherman Act. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984).

### *UAI's Section 2 Monopoly Claim*

UAI's Section 2 monopoly claim is based upon a series of acts, three of which allegedly constitute business torts recognized

---

5. UAI argues that this hearsay evidence is admissible under the co-conspirator exception. In support of this argument, UAI points to *United States v. Hernandez*, 829 F.2d 988, 993 (10th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1486, 99 L.Ed.2d 714 (1988) where the Tenth Circuit held that a Court may look at hearsay statements between alleged conspirators for the purpose of laying the necessary foundation to use the co-conspirator exception. Nevertheless, the hearsay statements cannot alone form the foundation for the application of the exception. *United States v. Gordon*, 844 F.2d 1397, 1402 (9th Cir.1988). No additional evidence of a conspiracy has been offered.

**1176**

under the common law. First, UAI contends that the departure of the five UAI Nastran employees and their subsequent hiring by UAI was the result of employee raiding by MSC. Second, UAI suggests that MSC engaged in the alleged employee raiding for the purpose of unlawfully misappropriating trade secrets belonging to UAI. Third, UAI alleges that on four different occasions MSC engaged in predatory pricing. Finally, UAI alleges that MSC engaged in the tort of disparagement.

Summary judgment is appropriate on UAI's Section 2 monopoly claim since UAI has failed to put forth evidence sufficient to raise a genuine issue of material fact as to any of the four alleged predatory acts it contends form the basis of that claim. Additionally, the Court must grant summary judgment in favor of MSC because UAI has not provided evidence sufficient to create a genuine issue of material fact as to whether MSC engaged in any conduct which lacked a legitimate business purpose. *Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 369 (9th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).[6]

■ Throughout this litigation, MSC has urged the Court to examine each of the four alleged predatory acts individually. Further, with regard to the three alleged business torts, MSC has urged the Court to measure the sufficiency of each alleged act under the common law business tort standard. UAI has countered by arguing that its complaint should be examined as a whole, rather than in segments, and that its allegations should be measured according to federal antitrust principles rather than state tort law. The Court agrees with MSC that each of the alleged predatory acts may be examined independently, *California Computer Products, Inc. v. IBM Corp.*, 613 F.2d 727, 746 (9th Cir.1979)

(each instance of defendant's monopolizing conduct can be considered separately "for purposes of analytical clarity"), and that to the extent UAI's allegations are couched in terms of common law torts, reference to common law principles may be instructive. However, in the final analysis, UAI's complaint must stand or fall as a whole, and must be judged according to the legal principles applicable to the federal antitrust claims at issue. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962).

With the foregoing principles guiding the Court, each of four alleged predatory acts which form the basis of UAI's monopoly claim will be examined in turn.

Employee Raiding

■ As stated in the opening paragraphs of this Order, the thrust of this lawsuit is that MSC acted illegally in luring five of six UAI Nastran trained employees to MSC over a fifteen month period. While this may be UAI's most viable theory in support of its antitrust claims, it is still unquestionably deficient. In support of this summary judgment motion, MSC provided undisputed evidence that several of the five employees were dissatisfied at UAI and desired to change jobs.[7] Further, MSC did not initiate contact with the employees but rather hired independent employment agencies to obtain qualified applicants. Additionally, the five employees are currently working on Nastran related tasks at MSC; they weren't hired solely for the purpose of injuring UAI. These facts preclude a finding that MSC engaged in employee raiding as defined under the common law. Common sense dictates that, at a minimum, in order for a plaintiff to allege employee raiding, there must be evidence that defen-

---

6. The Court agrees with Professors Areeda and Turner who state in their treatise that, absent egregious circumstances, common law business torts will rarely result in the harmful effects on competition necessary to form the basis for antitrust liability. *See generally,* 3 P. Areeda & D. Turner, *Antitrust Law,* ¶¶ 737–39, at 276–87 (1978). The remedy for such torts lies in state court.

7. In deposition, several of these employees expressed dissatisfaction with the treatment they received from UAI management and also complained about their low salary and long commute time.

dant actively attempted to persuade the employees to change jobs.[8] Here, there is no evidence before the Court from which a reasonable jury could find that MSC initiated any contact with the UAI employees. The UAI employees were dissatisfied with their working conditions at UAI and voluntarily sought to change jobs. Thus, UAI's employee raiding allegations are inadequate as a matter of law.

In opposition to MSC's uncontroverted evidence, UAI offered the two MSC internal memoranda referred to at the outset of this Order. All these memoranda indicate is that MSC was interested in employees who had Nastran experience and that by hiring UAI employees who had such Nastran experience, MSC was injuring its competitor. Nothing in the memoranda controverts the fact that MSC did not actively or in any way recruit the UAI employees. They departed UAI voluntarily. In addition to the two memoranda, UAI submits the fact that MSC had initially declined to offer jobs to several of the UAI employees and only hired those same employees after they had obtained several years of Nastran training. This does nothing to indicate that MSC made attempts to recruit the UAI employees. In the absence any evidence indicating any involvement by MSC in the departure of the five UAI Nastran employees, UAI's employee raiding allegations must fail.

**8.** In Annot., 24 A.L.R.3d 821, 824 (1969) it is stated:

> In order to establish a defendant's liability for inducing an employee to move to a competitor, it is generally necessary for the plaintiff to allege and prove that the defendant has actively attempted to persuade the employee to change jobs; and the competitor-defendant can prevail if he is able to show that the employee, in seeking employment with the competitor, acted solely on his own initiative, without having been solicited either by the competitor or by anyone acting in the competitor's behalf, and that the competitor was merely receptive to the employee's own suggestions.

See also *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1337 (9th Cir.1980) (Court reverses summary judgment for defendant in employee solicitation case and assumes for purposes of the motion that defendant solicited the employees. Issue was whether defen-

## Trade Secret Misappropriation

■ UAI contends that MSC engaged in misappropriation of UAI's trade secrets. In support of this motion, MSC correctly pointed out that UAI has failed to inform MSC or the Court precisely which trade secret it alleges was misappropriated.[9] When making a claim for wrongful use of trade secrets, "the complainant should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade." *Diodes, Inc. v. Franzen*, 260 Cal.App.2d 244, 253, 67 Cal.Rptr. 19 (1968). *See also* 1 Milgrim, *Milgrim on Trade Secrets*, § 2.09[3], at 2–214 (1988) ("when asserting methods and techniques and know-how to be trade secrets, a reasonable degree of precision and specificity is appropriate").

Apparently, UAI's trade secrets claim is based purely on the speculation that since the former UAI employees are working in similar areas at MSC and that after the employees began working for MSC, MSC announced improvements in its Nastran products, therefore MSC must be misappropriating UAI trade secrets. There is no logic to UAI's theory. More generally, however, UAI's allegations appear to suggest that MSC has acted unlawfully by using the know-how gained by the former UAI employees during their tenure at UAI. This must be rejected. "[S]ecrets acquired

dant engaged in some concomitant unconscionable conduct); *Operations Research, Inc. v. Davidson & Talbird, Inc.*, 241 Md. 550, 217 A.2d 375 (1966) (affirming trial court's findings that defendants did not solicit plaintiff's employees, but rather that the employees who left the plaintiff sought out the defendants, were anxious to work for them, and applied for employment with them without any specifications as to salary or type of work).

**9.** At a hearing on August 8, 1988, the Court acknowledged the confidentiality problems related to disclosure of the particular trade secrets allegedly misappropriated by MSC. The Court suggested that UAI may wish to disclose the nature of these alleged secrets to a neutral expert. UAI rejected this proposal and expressly conceded that the thrust of its case does not lie in its allegations regarding misappropriation of trade secrets.

and developed as a result of long employment in the particular trade may be carried over and put to use by the new employer." *Sarkes Tarzian, Inc. v. Audio Devices, Inc.*, 166 F.Supp. 250 (S.D.Cal.1958), *aff'd,* 283 F.2d 695 (9th Cir.1960), *cert. denied,* 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961). *See also Jostens, Inc. v. National Computer Systems, Inc.*, 318 N.W.2d 691, 701–02 (Minn.1982).

The only evidence before the Court is that each of the five former UAI employees declared under penalty of perjury that they did not misappropriate any UAI trade secret. Absent any countervailing evidence of trade secret misappropriation, UAI's trade secret allegations cannot form the basis of its Section 2 monopoly claim.

Predatory Pricing

■ The third predatory act, or, more precisely, series of acts, allegedly engaged in by MSC are four instances of predatory pricing. UAI contends that MSC engaged in predatory pricing by making an unreasonably low bid for a NASA contract in response to UAI's more competitive bid, by lowering the price it charged to Ford Motor Company on a specific contract, and by converting the hardware systems of two potential customers in order for their systems to operate with the MSC Nastran program. Each of these allegations is fatally deficient. Here again, UAI has failed to produce admissible evidence in support of its allegations, and, even had it produced such evidence, the allegations would be insufficient as a matter of law.

■ First, with regard to the NASA bid, it is undisputed that MSC's bid was more than four times higher than UAI's bid for the same contract, and that UAI ultimately received the NASA contract. More importantly, however, is the failure of UAI to demonstrate that MSC's bid was below its marginal or average variable cost. Under applicable Ninth Circuit authority, such a failure is usually fatal to a predatory pricing allegation. *California Computer Products, Inc. v. IBM Corp.*, 613 F.2d 727, 740 n. 19 (9th Cir.1979); *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 857–59 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977).[10]

■ Turning to the Ford contract, UAI makes this claim based solely upon the declaration of UAI's president wherein he states that he heard from an employee of the Prodigy marketing/engineering firm that MSC lowered its bid for a Ford contract from approximately $800,000 to about $500,000 for the purpose of damaging UAI's ability to compete. This evidence is hearsay and cannot be considered for purposes of this motion. Fed.R.Civ.P. 56(e). Even assuming the declaration was admissible, this allegation would once again be deficient for failure to demonstrate that the bid made by MSC was below its marginal or average variable costs. *See* footnote 10, *supra.*

10. More recently, in *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982), the Ninth Circuit adopted a more flexible test for predatory pricing. The court stated that "to establish predatory pricing a plaintiff must prove that the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power." *Id.* at 1035. Thus, it is conceivable that a claim of predatory pricing could be sustained where defendant's price was not below marginal or average variable cost. However, in cases where defendant's price was above average variable cost, the *Inglis* court stated that "*plaintiff* bears the burden of showing defendant's pricing was predatory." *Id.* at 1035–36

(emphasis added). Plaintiff in this case has failed to produce any evidence from which the Court could determine whether it has made out a prima facie case of predatory pricing. Under *Celotex,* summary judgment is appropriate since plaintiff has failed to "make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

This case is analogous to *Hanson,* where the Ninth Circuit upheld a directed verdict for defendant on plaintiff's attempted monopoly claim based on allegations of predatory pricing because plaintiff "made no effort to prove that the prices defendant was charging ... were below marginal or average variable costs...." 541 F.2d at 1358. *Hanson* has not been overruled and this Court finds it persuasive.

■ Finally, UAI submits that MSC engaged in predatory pricing when, in an effort to expand the market of computers that could operate its version of Nastran, MSC agreed to convert MSC/Nastran to make it compatible with several lines of Control Data Corporation ("CDC") and Digital Equipment Corporation ("DEC") computers.[11] UAI alleges that since MSC performed these conversions for no charge, MSC necessarily engaged in "pricing" below its marginal or average variable cost.

Plaintiff has produced no admissible testimony to refute MSC's claim that the conversions were performed for research and development purposes and were not "services" provided below cost. CDC and DEC are computer hardware producers whose customers are also MSC customers. By doing the conversions, DEC and CDC customers will be able to use MSC's version of Nastran. These consumers would still have to purchase MSC/Nastran once they purchase a computer from either CDC or DEC. At that time, if they wish to use MSC/Nastran, they will still have to pay MSC for the software. Nothing will be provided to the consumer for free.

According to Professor Areeda, research innovation and product development of the type engaged in by MSC in performing the conversions cannot constitute unlawful predatory conduct. If the courts were to make such conduct illegal, such a rule would be "virtually impossible to administer," and would "chill innovation by increasing the risks relative to the rewards." Areeda and Hovenkamp, *Antitrust Law*, 1987 Supplement, ¶ 718, at 482. The Ninth Circuit has also recognized the value of research and product development and has declined to classify such activities as predatory. *See Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377, 1382–83 (9th Cir.), *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983); *California Computer Products, Inc. v. IBM Corp.*, 613 F.2d 727, 744 (9th Cir.1979).

UAI's predatory pricing allegations are deficient in several respects. The first two claims fail as a matter of law because there is no indication that MSC set prices below its marginal or average variable cost, or that it otherwise acted unlawfully. Additionally, the Ford contract allegation is not supported by admissible evidence. The conversion claims are also legally deficient because MSC was engaging in protected research and development activities. Accordingly, to the extent UAI's Section 2 monopoly claim is based on predatory pricing allegations, MSC is entitled to summary judgment.

Disparagement

■ UAI's final contention in support if its Section 2 monopoly claim is that on four occasions MSC disparaged UAI.[12] Of the

---

**11.** Specifically, UAI alleged that MSC was approached by CDC and offered over one million dollars to convert MSC/Nastran to operate on CDC's new computer. MSC initially declined CDC's offer. Subsequently, UAI accepted CDC's offer, and converted UAI/Nastran to work on the CDC computer. Thereafter, allegedly for no charge, MSC converted MSC/Nastran to work on the CDC computer. UAI contends that this sequence of events demonstrates that MSC acted with the intent to compete with UAI in its dealings with CDC.

A similar series of factual allegations was made by UAI with regard to the DEC conversions. MSC initially declined to convert MSC/Nastran to the DEC computer. Once UAI began negotiating with DEC to perform the conversions, MSC allegedly agreed to convert MSC/Nastran at no charge. Once again, UAI submits that this conduct on MSC's part demonstrates a predatory intent to prevent UAI from competing in the Nastran market.

MSC controverted many of the facts UAI submit in support of these conversion allegations. More importantly, however, is the undisputed fact that MSC did not accept any money for performing the conversions. They were research and development activities. That MSC decided to perform the conversions only after UAI had some success with the new computers cannot make otherwise lawful conduct unlawful. To the contrary, MSC was only increasing competition in the Nastran market by performing the conversions.

**12.** The four instances are: (1) an unidentified longtime MSC consultant stated in front of an unidentified UAI customer that UAI was a training ground for MSC; (2) that same unidentified consultant made sarcastic references about the instant lawsuit in front of the same UAI customer; (3) Raj Kansaker, while still employed at UAI, told a UAI customer that he would be leaving UAI to go to work at MSC; and (4) Defendant Gloudeman and/or unidentified per-

four alleged unlawful statements, the only one supported by admissible evidence is the announcement to a UAI customer that a UAI employee was leaving to work for MSC. This innocuous statement cannot form the basis for a federal antitrust suit since there is no prohibition against a departing employee telling a customer that he or she is changing jobs. *Aetna Building Maintenance Co. v. West*, 39 Cal.2d 198, 204, 246 P.2d 11 (1952). More importantly, however, is the simple fact that the statement was made while the employee was still working at UAI. UAI has produced no evidence which would attribute the statement to MSC. Once again, UAI's complaint sets forth nothing but unsupported allegations and MSC is entitled to summary judgment.

The foregoing discussion has exposed UAI's failure to make a showing sufficient to establish a genuine issue of material fact in support of its monopoly claim. In addition, to UAI's failure of proof, UAI has not raised a genuine issue of material fact as to whether any conduct engaged in by MSC lacked a legitimate business purpose. Under prevailing Ninth Circuit authority, MSC is therefore entitled to summary judgment on UAI's monopoly claim.

The offense of monopolization under Section 2 of the Sherman Act contains three elements: (1) the possession of monopoly power in the relevant market; (2) the willful acquisition or maintenance of that power; and (3) causal antitrust injury. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 363 (9th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). The second element, willful acquisition or maintenance of monopoly power, "means that the monopolist must have engaged in willful acts directed at establishing or retaining its monopoly, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic

accident." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 543 (9th Cir.1983) (citations omitted), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984). More specifically, the requisite conduct necessary to satisfy the second element must be conduct which lacks a legitimate business purpose. *Oahu Gas*, 838 F.2d at 369. The presence of a predatory motive will not make otherwise lawful conduct (ie., conduct engaged in for a legitimate business purpose) unlawful. *Id.*

Applying these principles to MSC's conduct, MSC is entitled to summary judgment on UAI's monopoly claim as UAI has not demonstrated with admissible evidence that any conduct engaged in by MSC met the *Oahu Gas* "without legitimate business purpose" test.[13]

In support of its employee raiding allegations, UAI relied primarily on the two internal MSC memoranda, one of which contained the statement that, by hiring a UAI Nastran employee, MSC was "wound[ing] UAI again". Assuming that this statement evidences some predatory motive on MSC's part, no reasonable jury could find that MSC had engaged in conduct violative of Section 2. As stated at the outset of this Order, there are very few people who are trained in the Nastran area. Further, it takes several years for such a person to acquire his or her Nastran training. Therefore, MSC would certainly be meeting a legitimate business need by obtaining Nastran-trained personnel. That MSC hired the employees for a business purpose is supported by the uncontradicted evidence that MSC is presently using the former UAI employees in Nastran-related areas. Regardless of any alleged predatory motive which may be inferred from the MSC memoranda, employee raiding is not the type of conduct, at least on the facts of this case, which can constitute the willful acquisition or maintenance of monopoly power necessary for a § 2 violation.

sons made unspecified derogatory references regarding UAI's financial condition.

**13.** Whether conduct was motivated by a legitimate business purpose is not always a jury question. *Oahu*, 838 F.2d at 360; *California Computer*, 613 F.2d at 744.

*Oahu.*[14] In the absence of monopolistic conduct, the MSC memoranda cannot form the sole basis for a federal antitrust action. *See Trace X Chemical, Inc. v. Canadian Industries, Ltd.,* 738 F.2d 261, 268 (8th Cir.1984) (statements supporting inference of anti-competitive intent not enough to transform otherwise legitimate business activities into anti-competitive conduct), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985); *see also Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17, 19 (9th Cir. 1971) (statement by defendant's employee to plaintiff's employee that defendant would drive plaintiff out of business if plaintiff chose to compete cannot sustain a Section 2 claim. "Such a manifestation of intent to triumph in the competitive market, in the absence of evidence of unfair, anticompetitive or predatory conduct, is not enough to establish a violation of § 2").

Turning to the trade secret allegations, UAI has failed to produce any evidence from which a reasonable fact finder could conclude that MSC was not acting for a legitimate business purpose. MSC was satisfying a business purpose by using the Nastran knowledge obtained by the former UAI employees while they were at UAI. It would make no sense for MSC to hire UAI employees trained in Nastran and then put them to work in areas where their Nastran training would be of no use. Once again, MSC's conduct could not, under the circumstances of this case, constitute the basis for a Section 2 claim.

As for the predatory pricing allegations, given that there was no evidence that MSC provided any products below MSC's marginal or average variable cost, and that UAI failed to meet its burden of demonstrating a genuine issue of material fact it has already been demonstrated that UAI's allegations are deficient under the law. Further, with regard to the conversions, these most definitely satisfy a business purpose in that they enable more consumers to use MSC/Nastran and therefore they increase MSC's market. Accordingly, under *Oahu,* the predatory pricing allegations also cannot form the basis for the Section 2 claim.

Finally, turning to the claims of disparagement, the only statement which was

---

**14.** In their treatise, Professors Areeda and Turner state:

> Hiring talent cannot generally be held exclusionary even if it does weaken actual or potential rivals and strengthen a monopolist. There is a high social and personal interest in maintaining a freely functioning market for talent. It should flow to occupations in which it can be used most profitably, and we greatly value the individual's freedom to enjoy whatever employment opportunities the market offers....
>
> Acquiring talent not to use it but to deny it to possible rivals is exclusionary.... In the absence, therefore, of the monopolist's proved subjective intent to hire talent preclusively or of clear non-use in fact, employment should not be held exclusionary.

P. Areeda & D. Turner, *Antitrust Law,* ¶ 702, at 109–10 (1978). As stated above, it is undisputed that MSC is using the former UAI employees in Nastran-related areas. The Court agrees with Professors Areeda & Turner that, in such a case, MSC's conduct does not violate the antitrust laws. *See also Adjusters Replace–A–Car, Inc. v. Agency Rent–A–Car, Inc.,* 735 F.2d 884, 894 (5th Cir.1984) ("mere hiring away of employees from a rival is lawful.... The fact that the employee then uses her own skills and contacts—and not, for example, misappropriated trade secrets—to generate business for her new employer, even at the expense of her old employer, provides no basis for antitrust liability"), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985).

In opposition to this motion, UAI relies on a line of older decisions from other circuits which found that business torts, including employee raiding, could constitute per se violations of Section 1 of the Sherman Act. *See, e.g., Albert Pick–Barth Co. v. Mitchell Woodbury Corp.,* 57 F.2d 96 (1st Cir.1932); *Perryton Wholesale v. Pioneer Distrib. Co.,* 353 F.2d 618 (10th Cir. 1965), *cert. denied,* 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966); *Atlantic Heel Co. v. Allied Heel Co.,* 284 F.2d 879 (1st Cir.1960).

These cases are not persuasive for several reasons. First, they have been discredited or distinguished in later decisions of the courts that rendered them. *See George R. Whitten, Jr. v. Paddock Pool Bldrs.,* 508 F.2d 547, 561 (1st Cir.1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *Craig v. Sun Oil Co.,* 515 F.2d 221, 224 (10th Cir.1975), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976). Second, the facts of those cases demonstrate much more egregious conduct than UAI has been able to attribute to MSC. Third, Professors Areeda and Turner also disapprove of those decisions. 3 P. Areeda & D. Turner, *Antitrust Law,* ¶ 828, at 323 (1978). Finally, the decisions were not issued by the Ninth Circuit and, to the extent they remain good law, they are not binding upon this Court.

supported by the evidence cannot be attributed to MSC and therefore cannot form the basis of the Section 2 monopoly claim.

Under *Oahu Gas,* conduct engaged in for a legitimate business purpose cannot form the basis of a Section 2 monopoly claim. This is so regardless of the presence of any predatory motive on the part of the alleged monopolist. In this case, UAI has failed to raise a genuine issue of material fact as to whether MSC engaged in any conduct without a legitimate business purpose. Accordingly, even had UAI been able to substantiate its allegations with admissible evidence, summary judgment would be appropriate.

Attempt to Monopolize

In addition to its Section 2 monopoly claim, UAI has claimed that UAI violated Section 2 by attempting to obtain a monopoly in the Nastran market. This allegation may be disposed of without much discussion. The elements of the attempt claim under Section 2 of the Sherman Act are (1) specific intent to control prices or destroy competition with respect to a part of commerce; (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; (3) a dangerous probability of success; and (4) causal antitrust injury. *Transamerica Computer Co. v. IBM Corp.,* 698 F.2d 1377, 1382 (9th Cir.), *cert. denied,* 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983). In *Transamerica,* the court noted: "Conduct that does not constitute 'willful acquisition or maintenance' of monopoly power (thus precluding establishment of the offense of monopolization) *cannot* constitute the 'predatory or anti-competitive conduct' required to establish the offense of attempt to monopolize." *Id.* (emphasis in original). More specifically, "conduct lawful for a monopolist must, a fortiori, be excluded as a basis for the attempt offense." 3 P. Areeda & D. Turner, *Antitrust Law,* ¶ 828, at 321 (1978), *quoted in Transamerica,* 698 F.2d at 1382. Based on the analysis in the discussion of UAI's monopoly claim, MSC is entitled to summary judgment on the attempt claim as well.

*Conclusion*

For the reasons stated above, UAI is not entitled to a trial in this Court on its antitrust claims. As was appropriately stated in *Falstaff Brewing Co. v. Stroh Brewery Co.,* 628 F.Supp. 822 (N.D.Cal.1986) dismissing an antitrust complaint with prejudice:

[t]o require defendants to further defend an anti-trust action, where it appears that plaintiffs cannot properly allege, much less prove, anything beyond mere business torts or unfair trade practices, would be a gross miscarriage of justice. Plaintiffs, in fact, may have been harmed in their business by the alleged acts of the defendants. The remedy upon which they pin their claim, however, a civil antitrust action pursuant to sections 1 and 2 of the Sherman Act, was not intended to serve as either a shield or sword against such individual commercial injury.

Accordingly, MSC's motion for summary judgment on each of UAI's Sherman Act claims is GRANTED.

IT IS SO ORDERED.