**UNIVERSAL ANALYTICS, INC.,**
**Plaintiff–Appellant,**

v.

**MacNEAL–SCHWENDLER CORPORATION; Dr. Joseph Gloudeman; Dr. Richard MacNeal, Defendants–Appellees.**

No. 89–55062.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 1990.

Decided Sept. 14, 1990.

Bruce L. Gelb and Kenneth E. Chyten, Torrance, Cal., for plaintiff-appellant.

Robert E. Hinerfeld, Manatt, Phelps, Rothenberg & Phillips, Los Angeles, Cal., for defendants-appellees.

Before HUG, SCHROEDER and HALL, Circuit Judges.

PER CURIAM:

This is an appeal from entry of summary judgment in favor of the defendant in a private antitrust action claiming monopolization violations of section 2 of the Sherman Act, 15 U.S.C. § 2 (1988).[1] Plaintiff-appellant is Universal Analytics, Inc. ("UAI") and the defendant-appellee is Mac-Neal–Schwendler Corp. ("MSC"). Both parties occupy a small corner of the aerospace technology field, producing computer software programs called NASTRAN. The programs were originally developed by the National Aeronautics and Space Administration with which MSC contracted. We assume, as did the district court, that for purposes of deciding defendant's summary judgment motion, the relevant market is NASTRAN programs. We also assume that entry barriers to the market are substantial.

UAI filed this action in 1987, alleging various violations of federal antitrust and state laws. The district court granted summary judgment for the defendant-appellee in a comprehensive opinion which describes the nature of all of the allegations and the reasons why the district court concluded there were no material issues of fact with respect to any of them. The district court's opinion is reported at 707 F.Supp. 1170 (C.D.Cal.1989).

In this appeal, appellant provides us with no basis for overturning any of the rulings of the district court. The one issue which warrants our discussion is whether there were any genuine issues of material fact with respect to UAI's claim that MSC's hiring of five of UAI's six key technical employees in 1986 and 1987 was predatory in violation of section 2 of the Sherman Act. As the district court pointed out, that claim was the "thrust of this lawsuit." 707 F.Supp. at 1176.

Monopolization claims under section 2 of the Sherman Act are composed of three elements: (1) the defendant's possession of monopoly power in the relevant market; (2) the defendant's willful acquisition or maintenance of such power; and (3) causal antitrust injury. *The Movie 1 & 2 v. United Artists,* 909 F.2d 1245, 1254 (9th Cir.1990, as amended July 25, 1990); *see Oahu Gas Serv., Inc. v. Pacific Resources, Inc.,* 838 F.2d 360, 363 (9th Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).

The facts, which we must view most favorably to UAI, *see State Farm Fire and Cas. Co. v. Martin,* 872 F.2d 319, 320 (9th Cir.1989) (per curiam); Fed.R.Civ.P. 56(c), show beyond question that MSC did hire five key employees from UAI, and that the employees were difficult to replace because the training in this particular area requires two years. We also assume the hiring did result in some decrease in UAI's ability to compete with MSC, and UAI was MSC's only competitor of any significance. At all times relevant to this suit, MSC had approximately 90 percent of the market, and UAI, which entered the market in the early 1980s, about five percent.[2] Thus, we assume the first element of a section 2 claim was met. *See* 707 F.Supp. at 1173.

This brings us to the second element, whether UAI willfully maintained its monopoly power by illegally raiding UAI's employees. *See Christofferson Dairy, Inc. v. MMM Sales, Inc.,* 849 F.2d 1168, 1174 (9th Cir.1988). Because the district court resolved this case on summary judgment for the defendant after full discovery, we ask whether the non-moving party (here UAI) has presented a record adequate to support a favorable finding. *See Thur-*

---

**1.** This section provides:

**Monopolizing trade a misdemeanor; penalty**

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

**2.** The remaining five percent of the market was split among five competitors.

*man Industries, Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989). We find that UAI has not met this burden, and that the evidence is so one-sided that MSC must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). No reasonable jury could find that MSC illegally restricted competition.

The leading Supreme Court decision in recent years on monopolization is *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), in which the Supreme Court reasoned that an antitrust defendant's conduct is redeemed by a legitimate business purpose. *Id.* at 608–10, 105 S.Ct. at 2860–61; *see* Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J. 841, 849 (1990); *see also United States v. Grinnell*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). *Cf. Oahu Gas Service*, 838 F.2d at 368 (legitimate business justification immunizes monopolist against claim by competitor that it failed to aid). As the Supreme Court said, the key is whether the conduct was an attempt "to exclude rivals on some basis other than efficiency." *Aspen Skiing*, 472 U.S. at 605, 105 S.Ct. at 2859 (quotation and footnote omitted).

■ So far as we have been able to determine, this is the first reported case of a claimed violation of section 2 as a result of alleged employee raiding or predatory hiring. The conventional allegations of predatory conduct relate to pricing or refusals to deal. *See* L. Sullivan, *Handbook of the Law of Antitrust* 112 (1977); *see, e.g., Image Technical Services, Inc. v. Eastman Kodak Co.*, 903 F.2d 612 (9th Cir.1990) (refusal to deal); *William Inglis v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th Cir.1981) (predatory pricing). We agree with the district court that the allegations of predatory hiring stated a claim capable of surviving a motion to dismiss pursuant to Federal Rule of Civil Proce-

dure 12(b)(6), *see* III P. Areeda & D. Turner, *Antitrust Law* ¶¶ 702(a)–702(c) at 108–110 (1978), and that the case therefore turned on whether there were any genuine issues of material fact concerning UAI's allegations that the hirings were predatory. The most helpful and comprehensive discussion of the concept of predatory hiring is in Areeda and Turner, *supra*. Unlawful predatory hiring occurs when talent is acquired not for purposes of using that talent but for purposes of denying it to a competitor. Such cases can be proved by showing the hiring was made with such predatory intent, i.e. to harm the competition without helping the monopolist, or by showing a clear nonuse in fact.[3] Absent either of those circumstances, according to Professors Areeda and Turner, employment should not be held exclusionary.

Acquiring talent not to use it but to deny it to possible rivals is exclusionary. Such an arrangement has the same harmful tendency and the same lack of redeeming virtue as the promise by a non-employee that he will not compete with the monopolist. But unlike the latter agreement whose existence or nonexistence is a rather clear-cut question, exclusionary employment would be hard to identify. A monopolist would probably use important talent once acquired. And the court should not try to judge whether the acquired talent was used more effectively than readily available alternative personnel. Nor should it try to do so when the defendant pursues a hard-to-match, if not unmatchable, program of recruiting, say, young researchers in his field. In the absence, therefore, of the monopolist's proved subjective intent to hire talent preclusively or of clear nonuse in fact, employment should not be held exclusionary.

*Id.* at 110 (footnote omitted).

Here UAI claims it demonstrated predatory intent. The principal evidence offered by UAI to support its contention that MSC was guilty of predatory hiring was a memo from Michael Gockel, the Executive Vice

---

**3.** UAI might also have succeeded had it been able to demonstrate that MSC intended to pay the UAI programmers more than MSC could reasonably expect as a return from their work.

President of MSC, to Joseph Gloudeman, MSC's Chief Executive Officer, written before the third of the five UAI employees was hired. It read:

Do not put this in personnel folder—throw out.

Joe:

This guy came through some months ago, and we turned him down because he didn't give us a warm feeling. In your case, he made reference to Stuttgart connection, which you found implausible.

Since then, Nima B. [an earlier UAI employee] has given him a strong endorsement. As Nima is a winner, this is important. Also *we wound UAI again,* and Layfield has shown that he is hard-nosed enough to fire someone who does not work out.

I recommend a hire.

MG

(emphasis added).

These four words, "we wound UAI again," UAI insists, is alone sufficient to create a genuine issue of material fact as to the lawfulness of the hirings. We disagree. The memo shows that one reason for the hirings was to disadvantage the competition, but that MSC's primary motivation was to obtain a productive employee for itself, and that MSC had no intention of retaining the employee unproductively. The district court also had uncontroverted evidence that the employees were hired primarily for their programming competence in their specialized areas, the salary paid them by MSC was no more than a 20% increase over the wage they earned at UAI (amounting to, at most, $6,000), and all but one of them expressed frustration and unhappiness working for UAI. In no case did MSC seek out the UAI employees; each of the programmers made an independent effort to seek employment from MSC, largely through independent employment agencies. Additionally, each of the employees was free to leave MSC and return to UAI.

MSC did not require any of the employees to sign covenants not to compete or otherwise bind them to continued employment with MSC. Further, each of the UAI employees were immediately put to work in their area of specialization. None was permitted to languish in nonproductive or underproductive capacities.

The "wound memo" evidence was insufficient for a jury to find the requisite elements of predatory conduct on the part of MSC. The memo at most shows that a secondary motivation of the hiring was to disadvantage the competition. The memo does not undermine MSC's legitimate business reasons for hiring much needed and competent computer programmers, or permit a jury to find that any of MSC's reasons for hiring the programmers was pretextual.[4] See *Technical Services, Inc.*, 903 F.2d at 620 (business justification is not legitimate if only a pretext for exclusionary conduct).

Thus, the district court was correct that UAI failed to make a showing sufficient to establish the elements essential to its cause of action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Technical Services*, 903 F.2d at 620 & n. 9 (burden of proving intent and lack of legitimate business justifications lies with plaintiff).

AFFIRMED.

---

4. UAI also points us to the memorandum of an employee of MSC which noted, inter alia, that two UAI programmers seeking employment at MSC "represent two of the three remaining non-management programmers at UAI." However, as in the case of the "wound memo," the rest of the memorandum indicates that MSC's primary motivation was to hire employees with general NASTRAN experience, which UAI concedes are highly-prized in the industry. Thus, this memo does not make UAI's case any stronger.